FRIEDMAN *v.* HAMPTON.

4-9008                                              224 S. W. 2d 794

Opinion delivered December 5, 1949.

*R. B. Chastain,* for appellant.

*Harper, Harper & Young* and *Pryor, Pryor & Dobbs,* for appellee.

GRIFFIN SMITH, Chief Justice. I. J. Friedman is a licensed attorney of Fort Smith who deals extensively in real property. E. S. Friedman is his wife, and J. F. White, a resident of New York, is the married daughter

of the two. T. R. Parks, Negro, is employed at a mine, and prior to trial of the case at bar became separated from his wife, Elizabeth.

By contract of March 1, 1945, E. S. Friedman ''bargained to sell'' to T. R. and Elizabeth Parks ''and unto their heirs and assigns'' the house and lot identified as ''523 10th St., City Addition to Ft. Smith'', for $2,500. Title was retained until all payments should be made, and a lien in favor of the seller was created ''on all personal property now in or to be placed in said house''. The language creating the lien was written into a prepared form in a way that left clarity dangling by an obviously insecure lifeline, as may be observed from the footnote.[1]

In her complaint of December 31, 1948, Nell Hampton alleged that T. R. and Elizabeth Parks had by indorsement of November 4th, for a valuable consideration, assigned the contract to her, and under this assignment she acquired all rights of the purchasers. Her suit was to require the seller to accept payment of any balance the Court found due, and to compel execution of a deed. I. J. Friedman, sometimes signing his communication ''owner'' of the property, and on other occasions subscribing as agent of his wife, had demanded possession, coupled with a statement that the property could be sold for $5,000. As a matter of fact, the Friedmans joined in a deed November 19, 1948, conveying to Jeanne F. White, their daughter.

The answer filed on behalf of I. J. Friedman March 1, 1949, alleged that he sold the property to the Parks

[1] The entire sentence reads: "The [Friedmans] have this day bargained to sell unto the [Parks] and unto their heirs and assigns, the following described real estate, situated within the County of Sebastian, Arkansas, to-wit: Lot 523 No. 10th St., City of Ft. Smith, Ark., for the price and sum of $2,500, of which the said [Parks] have paid given a lien on all personal property now in or to be placed in said house, including all other payments dollars cash in hand, and have executed their joint notes of even date herewith, each for the sum of $2,500, bearing interest at the rate of 8% per annum from the date until paid, and payable as follows: $20, payable the 1st day of each month thereafter until paid in full, with 8% interest per annum from date until paid, also taxes, ins., int., water and all necessary repairs to keep the place in good condition. The $20 per month is to include payments for everything [the Parks] have to pay [to the Friedmans] but to be added to the principal and all to become of this contract."

for $2,500, payablé $20 March 1, 1945, and $20 on the first of each month thereafter until paid in full, "with interest at 8% per annum from date until paid". Title to said property was retained by I. J. Friedman. Soon after the contract was made Parks' wife left him, taking with her some of the household goods upon which a lien had been impressed, hence, as to Elizabeth, she had abandoned the undertaking. Although T. R. remained "in the house", he made default by failing, during 1945, 1946, and 1947, to pay insurance, water bills, and taxes. He also failed to pay the monthly installments when due, and money paid by an insurance company to Parks covering storm and water damages was "converted". In addition, repairs were not made, necessitating expenditures by the seller, etc.

Friedman further alleged that on February 3, 1947, he gave notice that the contract had been breached, and coupled this notice with a demand for possession. Again —February 20, 1948—there was written demand for surrender of the property, effective March 1. What is claimed to be a copy of this notice was filed as an exhibit, and "pursuant to this notice T. R. Parks surrendered possession . . . to I. J. Friedman, but was to remain in said dwelling house as a tenant and pay a monthly rental of $20, payable in advance". On January 30, following, Parks is alleged to have deposited $10 to Friedman's account in City National Bank, causing the receipt to be marked "rent". Parks had requested the bank teller to make similar indorsement on all deposit slips. Friedman tendered a copy of the letter he claimed to have written January 31 acknowledging the $10 deposit, but referred to the payment as having been made "today".

The acceleration clause of the contract is copied in the margin.[2]

---

[2] ". . . But if the purchase money . . . is not paid at the time and in the manner herein specified, [then] upon the first default made in said payments, all of said notes remaining unpaid shall at once become due and payable, and the obligations resting on [Friedman] shall become null and void, and the money theretofore paid on account of said purchase shall remain with and be the property of [Friedman] and shall be considered as so much rent paid by [Parks] for the use of said property from the date of this instrument to the date of such default in payment."

Decretal findings were that when the contract was made, title was in I. J. Friedman, who held for the benefit of his wife. As agent for Mrs. Friedman, and acting for himself, I. J. Friedman placed Parks in possession. Actual payments had equaled $20 per month through November, 1948. Mrs. Hampton's tender of contractual obligations was refused, as was her offer to pay all balances as though each item were currently due. Property of relatively small value, consisting of individually-owned bedclothing, was taken by Elizabeth Parks when she left her husband. If this constituted a breach of the contract, said the Court, subsequent acceptance of payments with knowledge of what had occurred constituted waiver. While monthly payments were not regularly made, forfeiture because of delinquencies had been condoned; nor had money paid by the insurance company for storm and water damages been converted. There was an express finding that Parks did not agree to surrender possession as purchaser, hence the relationship of landlord and tenant was not created. When Friedman was given credit for taxes, insurance, water rentals, repairs, interest, etc., the net balance was $2,688.98.

In a motion asking for amendment of the decree, Friedman alleged that the contract did not provide for a lump sum payment, but, rather, for $20 per month, "which includes insurance, taxes, water rent, and repairs". In a second effort to reopen, tender was made of deposit slips, showing *prima facie,* that beginning with January 23, 1948, and concluding with October 8th, ten "rent" deposits were made, aggregating $95. Before January the bank's indorsement had been, "On contract".

I. J. Friedman's explanation of the contract is that prior to March, 1945, because of prolonged illness, he was compelled to discontinue the practice of law, in which he had been engaged since 1913. Ownership of rent houses—most of them being in poorly developed areas—necessitated supervisory work that Friedman could not do, and since Mrs. Friedman did not want to personally collect from tenants, it was agreed between

husband and wife that all tenants should be given an opportunity to purchase on a basis comparable with rent; hence low valuations were fixed. When a sale proposal was made to Parks and his wife, a printed form was submitted in duplicate. The tentative buyers declined to sign unless all items of upkeep, such as taxes, insurance, water rental, etc., were included. This, say the Friedmans, "in effect made the contract a lease for life." Certain changes are alleged to have been made on the contract copy left with Elizabeth Parks.

There was introduced as trial evidence a so-called Homestead Affidavit, conformable to Act 247 of 1937, and Amendment No. 22 to the Constitution. It is dated April 6, 1944, and was signed by T. R. Parks, who assured authorities he was sole owner of the property, hence as a homestead it was tax exempt to the extent of the valuation fixed by law. This transaction is emphasized by appellee as evidence of Friedman's purpose to use Parks as an instrumentality of convenience, and as tending to impeach the claimed course of fair dealings.

Significant, also, is the statement of account, showing the amount Friedman says was due January 20, 1948. Listing the $2,500 note, interest for a year to March 1, 1946, was $200; insurance, $16.50; water, $60, and taxes, $18.88, the total being $2,795.38, against which $240 representing twelve $20 payments was credited. Without incurring any expense for repairs or upkeep, the year-end balance was $55.38 greater than in the beginning. Interest on $2,555.38 was then charged to March 1, 1947, ($204.43) and this, with water and taxes as in 1946, brought the total to $2,855.19, showing a balance of $2,615.19 after payments of $240. Then, for the first *ten months* of 1948, interest of $192.39 was charged. With other items the total was given as $2,896.56, with credits of $185.00, leaving a net balance of $2,711.56. Although the point is not raised by appellee, there is an apparent interest overcharge of $18.05. The balance of $2,615.19 is taken as a basis for calculations for a period of ten months, with $192.39 the result. This should be $174.34, reducing the total from $2,711.56 to $2,693.51. However,

other computations were made by the trial court in the light of testimony legally sufficient to sustain the final total of $2,688.98 arrived at.

We think the Chancellor correctly found that the contract, (in the hands of Negroes as to whom the proof shows ignorance and a reliance upon Friedman) was sufficiently ambiguous to justify Parks in believing that necessary repairs would be made by the sellers, and that monthly payments of $20 would be the extent of affirmative obligations, hence the letter of February 3, 1947, alleging a failure to maintain repairs and attempting to terminate the contract, did not accomplish the purpose intended; nor is there sufficient evidence to overturn the trial Court's finding that Parks did not agree to surrender his rights and become a tenant. The contention that Elizabeth Parks removed her bedding is too prurient for serious consideration. According to I. J. Friedman's correspondence, the real property had attained a value of $5,000, or $4,500 if sold by a commission agency. After Elizabeth Parks moved from the premises, her husband rented rooms for $40 per month. It is Friedman's thought that increased payments should have been made when Parks' income was thus augmented. The roomers were more or less transient and this income was but temporary. Still, the answer is that Parks had an equitable interest, and a right to let the space.

When it was demonstrated that payments under the contract were insufficient to discharge the assumed obligations, Friedman could not convert the agreement "into a perpetual lease" by standing on the alternative proposition: that having failed to oust Parks, the original status should be decreed. Such a course would make the assignee pick up where Parks left of, with a debt more than two hundred dollars greater than in the beginning. It would overlook the financial absurdity that by no process of rationalization could the seller have intended the agreement to be what the title expressed—"A Contract to Sell Real Estate".

In these circumstances the Chancellor was justified in reforming the instrument by a requirement that the seller do what he persuaded the buyer to believe—that a home could be ultimately acquired.

Affirmed.